The following is the opinion of
Smith, C. J.:[1] —
By these pleadings, as it respects the second count, in which the plaintiff sets up a claim to exemption from the Rev. Mr. Barnard’s salary for 1795, it is admitted that the plaintiff was and is a Presbyterian; and the only question referred to the decision of the court is whether Presbyterians are, within the meaning of our Constitution, of another or different persuasion, sect, or denomination, from Congregationalists. If they are, the plaintiff is entitled to recover upon this count. If not, he was rightfully taxed, the replication is sufficient, and the defendants must have judgment. The question is important, inasmuch as there is involved in it the construction of a great and fundamental article of the Constitution, an article in which every individual is concerned, and which has at all times, when drawn into discussion, excited a great degree of interest and zeal. It is of importance that we should decide aright, and that the grounds of our judgment should be clearly and certainly known, as a rule to be followed hereafter in all cases of the like nature. The best, if not the only, way to arrive at the true sense of any particular clause in the Con *4 stitution, is to examine all the parts of that instrument which relate to the same subject, compare them together, and then put that sense upon it which, on a fair consideration of the whole, we collect the framers intended it should bear. This is the more necessary, as it is apprehended that very erroneous opinions have been entertained on the clause of the Constitution which relates to religion and the right of conscience.
I. By the fourth, fifth, and sixth articles of the Bill of Rights it is declared “ that the rights of conscience are founded in nature and are unalienable ; that every individual has a right to worship God according to the dictates of his own conscience and reason; and' that no one shall be hurt, molested, or restrained, in his person or his estate for thus worshipping his Maker, or for his religious profession, sentiments, or persuasion, provided he doth not disturb the public peace or disturb others in their religious worship ; that every denomination of Christians demeaning themselves quietly and as good subjects of the State shall be equally under the protection of the law, and no subordination of any one sect or denomination to another shall ever be established by law.” (a)
That society, or, which is the same thing, that the civil magistrate, should ever undertake to prescribe to men what they shall believe and what they shall not believe, is a thing so absurd that we should hardly believe it upon less evidence than that of experience. Opinions are not the proper objects of human authority. The mind of man was not intended by its wise Creator to be subjected to the control of finite and limited beings like itself. Freedom of thought is the prerogative of human kind (Eden, 91), (b) a quality inherent in the *5 very nature of a thinking being, a privilege which ought never to be denied. And yet we find an English Parliament making it treason to bo willingly withdrawn or converted to the Popish religion. Eden, 144. (a) Equally, absurd was the Act of the same Prince which made it treason to believe that he was married to Anne of Cleves. Eden, 93. (b)
The infallible Church of Rome condemned the Copernican System as a heresy, and the famous Galileo was imprisoned for believing and teaching it. He was obliged to recant and curse his former opinions, and swear that he would believe so no more. This was compelling him to promise what he could not perform, (c) Mere difference of opinion has been deemed an offence. The weaker body, though perhaps the stronger mind, was always the offender. It is still more unjust and absurd for government to extend its jurisdiction over the *6 opinions of men in matters of religion, (a) Religion is that sense of Deity, that reverence for the Creator, which is implanted in the minds of rational beings. It is seated in the heart, and is conversant with the inward principles and temper of the mind. It must be the result of personal conviction. It is neither to be produced by fines and penalties, nor can it be extirpated by them. It is a concern between every man and his Maker. The laws which regulate faith come immediately from the author of the human soul. They are not like human laws to-day, commanding us to believe what to-morrow we are roasted alive for believing. They are always the same, and will remain the same when the laws and constitutions of men shall have only an historical existence or be utterly forgotten.
No human government has a right to set up a standard of belief, because it is itself fallible. (b) It has not pleased God to enlighten by his grace any government with the gift of understanding the Scriptures. Uniformity of opinion in matters of faith is not practicable, and, if it were, is not desirable, (c) All the means that have been used for the purpose at all times and in all places have multiplied, instead of diminishing, *7 sects and opinions. In the English statute book we find an act for abolishing diversity of opinion in certain articles of the Christian religion, (a) The preamble recites that great advantages result from unity of sentiment, and that many evils flow from diversity of opinion, in religious matters, that the King had summoned Parliament and the Convocation for the express purpose of putting an end to this diversity; that among other questions he had submitted this to these two venerable assemblies, “ Whether, after consecration in the sacrament of the Eucharist, the substance of the bread and wine remains, or no ? ” that his Majesty had commanded this question to be discussed, and, what is more, to be understood ; and, to accomplish so desirable an object, had himself mingled in the debate, and given a specimen of his princely knowledge. The result of this assemblage of talents, wisdom, and piety is stated in the enacting clause: “ Therefore it was resolved, agreed, and enacted, by authority of Parliament, that, in the sacrament, by the strength and efficacy of the word of Christ spoken by the priest, the natural body and blood of Christ, conceived of the Virgin Mary under the form of bread and wine, is really present, and of course the bread and wine no longer remain.”
In truth, this question was no better understood after this act passed than before. Things remained exactly as before, unless it was that the opinions of men became still more diverse, from tins absurd attempt to unite them, (b) Persecu *8 tion on account of religious opinions is no less opposed to sound policy, to the sentiments of nature and humanity, than it is to the mild precepts of the Gospel of Peace.
A celebrated Englishman of the present day (a) observes that it is his ardent wish to extirpate heresy by fire, —not, indeed, in the old mode of burning heretics, but by burning all the statutes which declared the offence of heresy and thus formed ■the code of persecution. This is precisely the course taken by our Constitution. It cuts up persecution by the roots. It secures to every man the free enjoyment of his opinions on religious subjects. It prescribes no articles of faith. It forbids the legislature to prescribe any. It leaves every man free to examine and judge for himself. Let it not be imagined that this provision was unnecessary and useless. (b) Mankind have always been disposed to persecute their fellow men. (c) But, as long as this charter of our liberties remains inviolate, there can be no persecution in this State on account of religion. Every man may worship God according to the dictates of his own conscience and reason; and even those who deny their Maker this “ most reasonable service,” who refuse to worship him, or who entertain erroneous opinions of him, his attributes, and his religion, are referred for trial and punishment to him whose judgment cannot err, and who will surely render to every man the just reward of his own doings, (d)
*9 II. But our Constitution goes further. It wholly detaches religion, as such, from the civil State. By the mixture of civil and spiritual powers, both become polluted. 8 Warb. Semi. 300, 801. The civil uses religion for an engine of State to support tyranny, and the spiritual becomes invested with the sword of the civil magistrate to persecute. Under our Constitution there is no such union, no such mixture. No one sect is invested with any political power, much less with a monopoly of civil privileges and civil offices. The particular sect, or denomination, to which a citizen belongs neither promotes nor hinders his political advancement. It is his character, not his opinions; his works, not his faith, — that is to be regarded. All denominations are equally under the protection of the law, are equally the objects of its favor and regard. No one denomination is subordinate, that is inferior in degree, to another, for all are equal. Nothing could be better calculated to promote the peace and tranquillity of society than this excellent provision. It is admirably calculated to prevent religious hate; to assuage the bitterness of religious contests, which (when religion is connected with the State) are the *10 bitterest of all contests. It holds forth no motive to incite each man to divine the opinions of his neighbor, and to deduce mischievous consequences from them. It furnishes no motives to hypocrisy, nothing to gratify the passions of avarice and ambition. On the contrary, the collision of opinions in open and liberal discussion among men living under the same government, which it permits and cherishes, cannot fail to produce the most happy effects in the promotion of knowledge, candor, and charity. In a word, our Constitution regards men as they are regarded by the great Governor of the world, who bestows the blessings of his providence on all the children of men, however diversified by modes of faith, and however divided into sects and denominations, (a)
III. Under the two preceding heads we have seen that the Constitution secures the citizens of this State against persecution on account of their religious faith and worship. It declares that all men are equal in the sight of the law, are equally eligible to honors, places, and employments, without any other distinction than that created by their talents and virtues. (b) Religious opinions form no ground of distinction. But we are not from hence to infer that the civil magistrate may not lawfully punish certain offences against the unalterable and essential principles of natural and revealed religion, for these principles are said to make a part of the common law. Of this description are the offences of blasphemy, (c) reviling religion, profanation of the Sabbath, &c. Nor are we *11 to infer that religion is a thing of no consequence to society. The reverse is the case. (a) Religion, in the strict sense of the word, is a personal concern. It is a matter between God and every one of his rational creatures. Yet religious principles have the most unbounded and the most salutary influence on the affairs of men united in society. It is declared in our Constitution that morality and piety rightly grounded on evangelical principles, that is, on the principles of the Gospel, will give the best and greatest security to government, and will lay in the hearts of men the strongest obligations to due subjection, or, in other words, will make the best citizens and subjects; that the knowledge of these is most likely to be propagated through society by the institution of the public worship of the Deity, and by public instruction in morality and religion. It is then declared that, to promote these important purposes, the legislature may empower the several towns, corporate bodies, and religious societies in the State, to make adequate provision for the support and maintenance of public teachers of piety, religion, and morality; to be elected by the majority of the corporation. The legislature have done as they were required, and have given to towns and parishes the authority they were thus enabled to give.[1]
*12 The principles upon which.towns and parishes, in their corporate capacity, are enabled to support and maintain public instruction in religion and morality, which have just been detailed, are not the more true and solid for being recognized in our Constitution; but their being found there justly authorizes those whose duty it is to interpret that instrument to weigh and consider them in judging of the extent, the limitation, and the restrictions of the power conferred; and, taking those principles into consideration, we are bound to suppose that a power so beneficial and salutary in its consequences, so necessary to the well-being, if not to the very existence, of a free government, was not intended to be rendered wholly nugatory by any thing contained in other parts of the same instrument. We are bound to give that construction to the various clauses which will give effect and meaning to every part. We are to collect the meaning from the whole instrument, not from disjointed parts. Under these impressions, and with these rules of construction for our guide, let us examine that clause of the sixth article of the Bill of Rights which the plaintiff relies upon in support of his claim to exemption. It is this : “ No person of any particular religious sect or denomination shall ever be compelled to pay towards the support of the teacher or teachers of another persuasion, sect, or denomination.”
And here it may be useful to observe that, if this clause had been omitted altogether, there would have been neither any violation of the rights of conscience, nor any proper religious establishment in the State, (a)
A religious establishment (b) is where the State prescribes *13 a formulary of faith and worship for the rule and government of all the subjects. 5 Senator, 742. Here the State do neither. It is left to each town and parish, not to prescribe rules of faith or doctrine for the members of the corporation, but barely to elect a teacher of religion and morality for the society, who is to be maintained at the expense of the whole. The privilege is extended to all denominations. There is no one in this respect superior or inferior to another. The minority of each corporation can neither be molested on account of their religious opinions, nor subjected to any civil disabilities.
The Constitution, viewing religion in some form or other as useful if not indispensably necessary to make good subjects; not being able to decide between contending sects as to which is most agreeable to the Word of God, the infallible standard, but viewing them all as equally good for the purposes of civil society, because they all inculcate the principles of benevolence, philanthropy, and the moral virtues (Blackst. Appendix, Furneaux Lett. 94) ; (a) considering, too, that public instruction in the genera] principles of religion and morality can only be maintained by enabling corporate bodies to support and maintain it, — under these impressions and with these views, confers the powers in question.
Independent of the exempting clause, it is true an individual member of the corporation would sometimes be compelled to pay towards the support of a teacher of a different denomination from his own, but still the conscience would be left free.[1] He need not believe as the teacher or the majority believe. He need not worship as they worship. He may believe and worship in his own way, or not believe and not worship, just as he pleases. His conscience is free, his civil rights unimpaired. It is his misfortune that, in electing a teacher of religion and morality, he happens to be in the *14 minority.[1] His situation, in this respect, is precisely the same as it is in other civil concerns of the State. The minority are compelled to pay for instruction in learning, though they may be of opinion that the schoolmaster chosen by the majority neither promotes learning nor good manners, but the contrary. So the minority are compelled to pay towards the support of a governor, judges, &e., because the majority think these men advance the happiness and promote the good of society, though the minority may think they corrupt and injure the community. Public teachers of religion and morality chosen by a corporate body, are to every purpose civil officers of the State, as much so as schoolmasters and magistrates. The corporation choose them and maintain them because they believe their instructions will promote the good of society. Public instruction in religion and morality, within the meaning of our Constitution and laws, is to ever}' purpose a civil, not a spiritual, institution. The relation that subsists between a minister and the town is civil; that which subsists between a minister and the church is spiritual. Hence, the former is regarded in our laws, and the latter is not. Society has a right to judge what will promote the good of society, and to provide for it at the expense of the whole, (a) The minority must submit to the judgment of the majority. No civil regulation can be made or adopted which does not militate with the opinions and the wishes of individuals. Some there are who profess to believe that learning is no way useful to the State. They are permitted to enjoy their opinions; but they are not on that account excused from paying. There are persons who profess to believe that war of every kind is unlawful; “ they are conscientiously scrupulous about the lawfulness of bearing arms.” Thirteenth *15 article N. H. Constitution ; 1 Gibb. 492, 493. And this is the scruple of a respectable religious sect. They are indulged in their scruples, but they must pay an equivalent, they must pay those who do fight, (a) An individual may in his conscience believe that his nation wages an unjust war, but as long as he continues a member of the State, he must contribute his quota towards carrying it on.
In short, on this subject of conscience, there is no mistake more common than for men to mistake their wills and their purses for their consciences. (b) Whatever other objections, therefore, may lie against the plan of authorizing towns to elect and support public teachers of religion and morality at the expense of every member, it is clear that it would be no infringement of the rights of conscience, (c) The question *16 before the Court, therefore, does not involve in it a matter of conscience. It is a mere question of the extent of a civil obligation and a civil duty; that is, how far a corporate body can compel its members to support the public teacher chosen by the corporation pursuant to the Constitution.
IY. It is admitted that the plaintiff is a Presbyterian, and that a majority of the persons composing the First Parish in Amherst, and their teacher, are Congregationalists. Are these different sects, or are they one and the same ? What is the criterion by which we may be enabled to decide the question ? Is it a difference in faith, in doctrinal points ; or is it a difference in the form of church government, discipline, and worship, which constitutes different sects and distinguishes one set of Christians from another ?
Most, if not all, the religious sects have their confessions of faith and their platform or directory of church government, discipline, and worship. We find that many sects agree in the main as to matters of faith, but differ in their platforms of government and discipline.
. The Episcopalian, Presbyterian and Congregational Churches agree in articles of faith, and differ in government, discipline, and worship. Warb. Sermons, 207. (a) Presbyterians, Independents, Baptists, in England, all subscribe doctrinal articles of the Episcopal Church. 4 Blackstone, 53. (b) They are still nonconformists, Mass. Hist. Coll. IX. 42, n.; that is *17 they refuse to conform to the peculiar rites, ceremonies, discipline, government, and externals of religion as practised in the Episcopal Church, because they profess to believe them unscriptural. But, notwithstanding this agreement between the different sects as sects, bodies of men, or distinct societies, yet the individual members of each of these sects differ widely in faith and doctrine, (a)
In the Episcopal Church there are Calvinists, Arminians, Universalists, &c. The same may be said of the Presbyterian and Congregational Churches. If we say that articles of faith are what only distinguishes sects, then Episcopalians, Presbyterians, and Congregationalists are of the same sect. If we say that doctrinal points enter into the discrimmation at all, then individuals among Presbyterians, Congregationalists, and Episcopalians are of the same sect, for they are Calvinists, Arminians, Universalists, &c. ; and individuals in the Episcopal Church are of different sects, for some are Calvinists, some Arminians, some Universalists, &c. But according to the common and usual acceptation of the term sects, (b) matters of faith are not considered. The Episcopalians are a sect; the Presbyterians are a sect, &e. The individual members do not agree in doctrine, and among Episcopalians there are not many sects, though there is much diversity of opinion in articles of faith, and perhaps no two Episcopalians understand the Thirty-nine Articles precisely in the same sense ; yet they are all of one denomination.
*18 If, therefore, we allow doctrinal articles to enter into the definition of sect, the term becomes immediately indefinite and uncertain in its meaning; and, wbat is more to our purpose, affixing this sense to the term will render altogether nugatory that clause in the Constitution which enables corporate bodies to support and maintain public instruction in religion and morality. To illustrate this idea, let us suppose a whole town or parish to be composed of Episcopalians. They elect an Episcopalian teacher. An individual refuses to pay, because the majority or the parson is a Calvinist, and he an Arminian. How is this matter to be tried ? Who shall determine as to the creed of the parson or the person claiming exemption ? We must take the parties’ word for it; we cannot have better evidence. Then the corporation may make a contract as a corporate body, and yet every individual upon his own declaration merely may be loosed from the bond. What is this but saying that the corporation may coerce all who choose to be coerced ; may force the willing, but not the unwilling ; or, in other words, the corporation shall not exercise any of the powers of a corporate body.
This absurdity is not attached to the other opinion, namely, that a difference in government, discipline, and worship alone constitutes the difference of sects and denominations, (a) If an individual claims exemption on the ground that he is a Baptist, &c., the truth or falsehood of his plea may be examined and tried by a jury. Though God alone is the absolute judge of a man’s faith and of his conscience, yet the world can judge as to what'sect he belongs.[1] Circumstances will serve to evince whether he is what he professes to be or not, *19 whether he is sincere in his declarations that he belongs to this or that sect. Is he consistent throughout ? do his actions correspond with his declarations ? All these things may be and must be manifested by overt acts. It is a just and excellent maxim, which will hold good in this as in all other cases, “ By their fruits ye shall know them.” If he is really and truly a Baptist, as he professes to be, it will appear. He will attend their meetings, not now and then, but frequently, constantly. He will join with them in divine worship in their way, not occasionally, but statedly. He will conform to their rites and ceremonies, submit himself to their government and discipline. Is his profession assumed merely that it may serve as a cloak to screen him from paying taxes in the society to which he belongs ? His actions will demonstrate. If his actions show this, he is a pretended, not a real, Baptist; and his profession shall not avail him. So if he has joined different sects at different times, and especially if he has done so from improper views, (a) So if he appear to be an atheist, deist, a reviler and contemner of religion, or a person of no religion. (b) All these things are capable of proof. But how shall it be proved what is the doctrinal belief of a parish, or even of a parish priest, or any individual member ? Who is capable of ascertaining precisely who are Calvinists and who Arminians, who are Arians and who Socinians ? It would many times puzzle a jury of theological doctors to decide. I may add, it would puzzle many people to pronounce as to their own creed. Most people, I presume, have opinions in matters of religion; but there are few who can tell what they are, and fewer still who can compare them with the opinion of others and mark their agreement and their disagreement. It would require a very nice compass and a skilful theological surveyor to run the divisional line between Calvinists and *20 Hopkinsians. What allowance shall he make for the variation of the needle? We have new and old Calvinists, rigid' and liberal Hopkinsians, new and old divinity, (a)
Disagreement in opinion as to the doctrines maintained by sects may have many times occasioned new sects to spring np. But every difference of opinion has not • proceeded to this length; and even where it has occasioned a separation, the dissenters generally, if not always, differ more in government, discipline, and worship, that is, in the externals, than in articles of faith. It is wholly immaterial to our present purpose whether doctrine, or government and discipline, is of the greater or less importance. The former does not, and the latter do, admit of being known and established by evidence. At the same time, it may be proper to remark that mankind have at all times more obstinately adhered to the ceremonies of religion than to the doctrinal parts. The externals of religion have always made a greater impression on the multitude than the internals. (b)
We may then safely conclude that by sects spoken of in the Constitution we are to understand a body of Christians cut off or separated from the rest, — for this is the strict meaning of the word (3 Senator, 585), (c) —who live apart and by themselves, having a form of church government, discipline, and worship different from others, and especially from those from whom they separated, and who thus, forming a distinct sect, section, or society, acquire a name or denomination.
In ascertaining the sense and meaning of laws and constitutions, little confidence, perhaps, is to be placed in the strict meaning of words, or on arguments deduced from nice and critical construction. If it would not be thought refining too much in this way, I would observe that each of the words *21 used in the paragraph under consideration has a particular and appropriate meaning, and that altogether they bear the sense I have put upon them. Persuasion refers to the opinion, conviction, or belief which occasions the separation. Sect means the party persuaded, or who, entertaining opinions different from the rest, are cut off or separated from the main body. Denomination is the next step in the process. It signifies the name the sect acquires when actually separated, and which is generally descriptive of the principal points in difference, (a) Thus Episcopacy is the government of the church by bishops, in opposition to Presbyterianism, or the government of tlie church by presbyteries or presbyters. Independents are so called from their maintaining, in opposition to botli the other sects, tliat each congregation is a complete church, and is in no respect subject to the control of others. The same observations may be made respecting Baptists, Quakers, &c. Where the difference is respecting • matters of faith, the founder of the particular opinions generally gives his name to the disciples of that faith, as Calvinists, Lutherans, Arminians, Allans, Socinians, &c. It is true, as lias been observed, that the word persuasion is oftentimes used with reference to sentiments or belief in doctrines. It is so used in Article V. But it is also used as synonymous with the words sect and denomination. (b) In this place it cannot alter tlie sense. In another part of this Article the same idea is conveyed by the word denomination alone. So sect and denomination are in this very paragraph used as equivalent to the three words, persuasion, sect, and denomination. This construction gives us solid ground to stand upon. Persuasion, sect, or denomination comprehend Episcopalians, Baptists, Congrogationalists, Quakers, &c. Among these the discrim *22 inating features are well marked, — it is true, with lines of different degrees of distinctness and boldness, but still, with respect to all, marked and known. There are known bounds and limits to sects and denominations. But, if matters of doctrine discriminate, how far shall it be carried, where shall we stop ? There are a great? number of divisions which have acquired a name of distinction, but the real divisions are still more numerous. No two persons precisely agree together, and the same man at different times differs from himself, (a)
V. Our next inquiry is, Do Presbyterians differ from Congregationalists in discipline, church government, and worship, in the external forms; are they a separate and distinct society; do they usually associate and worship by themselves ? (b) If we apply these tests to deists (for as to atheists, it is not proper to consider them as a religious sect), Calvinists, Arminians, Hopkinsians, Universalists, &c., it will appear that these are not distinct sects: they are found blended with all sects. Among Episcopalians there are Calvinists and Arminians; there are also many Universalists. Some of the dignitaries of the Church have embraced the Universal scheme; Bishop Newton was a Universalist. Among the Congregationalists and Independents we may mention Dr. Priestley, Dr. Chauncey, Dr. Huntingdon, &c. Generally speaking, the Universalists have no distinct formulary of government and discipline. In large towns they sometimes associate and worship together, (c) But embracing this tenet makes, in general, no more difference as to the *23 form of church government and discipline than embracing the Calvinist, Arminian, Hopkinsian opinions does.
Let us now apply these tests to Presbyterians and Congregation alists.
1. The Presbyterians have a distinct directory of church government and discipline set forth in the same volume with their Confession of Faith, but separate and distinct from it. (a) Just so the Congregationalists have their code, called the Platform of Church Discipline, agreed upon at Cambridge, 1648, and afterwards ratified in 1680. They have also their Confession of Faith, in substance agreeing with the Presbyterian and the Episcopal, and differing little from tbe Romish.
2. Presbyterians usually worship by tliemselves, and form a distinct society from the other sects. Let us look at their origin. (“Presbyterians,” “Independents,”Encyclopedia.) They are as old as the Reformation. With the Lutherans they separated from the Church of Rome, but they soon separated from each other. The Lutherans established the Episcopal form of church government. The disciples of Calvin established the Presbyterian, and it has existed ever since on the continent. It was afterwards established in Scotland, and carried by the Scotch, who immigrated in great numbers to Ireland, and planted there. It was brought both from Scotland and Ireland to this country, and churches have been formed here on the model of the Church of Scotland, and professing to be governed by the same directory. Presbyterians, as Bishop Warburton justly observes, did not spring from fanaticism, as many wild sects have done. (b)
The Independents are a sect of modern date, (c) The hierarchy established by Queen Elizabeth, the vestments (d) worn by the clergy in the celebration of divine worship, the *24 Book of Common Prayer, (a) the sign of the cross used in baptism, &c., were considered by many persons as too nearly resembling Popery; and a purer worship and more perfect reformation were demanded. These persons were called Puritans. (b) They divided from the Church, or rather the Church cast them out. Brown (c) first, and Robinson after-wards, moulded a certain portion of this mass into the sect now known in England by the name of Independents. From thence sprung Congregationalists in this country, (d) Both *25 in the Old World and in this, Presbyterians, Independents, or Congregationalists form distinct religious societies or churches.
The same learned prelate I have already quoted, treating of the origin of the Independents, says they are 'the spawn of the persecuted Puritans. 3 Warb. Serin. 267, 272; 2 Rapin, 802. (a)
3. So much for the origin of the two sects ; but still it may be ashed, Do Presbyterians and Congregationalists differ from each other ? They think they differ, for they live apart from each other, and form distinct societies. Winthrop’s Journal, 308, 309. The Independents in England and the Congregationalists here have not yet adopted the Westminster Confession of Faith, and directory and form of Presbyterian church government and discipline. And the Established Church of Scotland have yet manifested no desire to exchange it for the New England Platform. (b) But Presbyterians and Independents have given higher, if not better, evidence of their being, at least in their own opinion, distinct sects; for they have persecuted each other even unto the death, with all the rancor of religious hate, when either could get the sword of the civil magistrate into their own hands. 2 Rapin, 546. (c)
4. It has been mentioned that Presbyterians and Congregationalists have distinct directories or platforms of church government and discipline. If we look into these, we shall find that they differ as much as other sects.
(1.) As it respects different orders of men in the church, ordination, &c.
The Presbyterians believe that there is a permanent order of ministers in the church; that the authority of those *26 ministers to preach the gospel, to administer the sacraments, is derived from the Holy Ghost by the imposition of the hands of the presbytery ; that in all the externals of religion, the great body of Christians are bound to obey. In short, they agree with the Episcopalians, that there is a permanent order of ministers ; but they differ from Episcopalians in the number of orders and in the manner of their creation, — the Episcopalians maintaining that there are divers orders, bishops, presbyters, and deacons, and that the highest only has the power of ordination ; while the Presbyterians maintain that there is only one order, namely, presbyters. Both deny the validity of lay ordination.
The Independents and Congregationalists (a) differ from both. They deny that there is any permanent order of ministers constituted by Christ or his Apostles; [they believe] that a man may become a minister without the sanction of any permanent order of men. They believe that the imposition of the hands of a bishop or presbytery conveys no spiritual powers or prerogatives; that a man may be constituted a pastor by election of the church and acceptance on his part; (b) these are every thing; “ ordination is nothing but the putting a man into his place and office, whereunto he had right before,” and may be performed by the brethren of the church, (c) They attribute no virtue *27 whatever to the rite of ordination, upon which Presbyterians, as well as Episcopalians, lay so much stress.
(2.) The Presbyterians maintain that ministers constituted in their mode, together with a certain number of laymen (chosen and ordained by them), form a judicature (1 Hubbard, 184, 189), and are clothed with certain powers in ecclesiastical matters, extending over all Presbyterians in the same kingdom or state. Such society or parish has its session; a number of parishes form a presbytery; a larger division a synod, — and the whole are united under a general assembly. Churches or societies are not independent of eacb other, but connected and dependent. These different judicatories have cognizance of all questions relative to tlie government and discipline of the cliurcb and congregation. They examine, admit, ordain, and censure ministers; they license probationers; censure gross and contumacious sinners ; direct the sentence of excommunication: resolve cases of conscience ; explain difficulties in doctrine or discipline. In these particulars consist the external order, strength, and steadfastness of the Presbyterian Church.
*28 Among Congregationalists (a) each church is independent, if it chooses to be so. Each chooses and expels its members and its officers, and the sentence is final. Mass. Hist. Coll. IV. 134, 135; Mass. Hist. Coll. IX. 12, &c., 15, &c. Winthrop’s Journal, 55, 56, and ante, 57 ; Colony Laws, 101. Among Presbyterians, if a member is expelled or excommunicated, he may be restored by a higher tribunal, and those who expelled him sentenced to take his place. The Episcopalians, in matters of faith, discipline, and government, acknowledge, as superior, the king, bishops, &c. The Presbyterians, in matters of government and discipline, acknowledge, as superior, synods and general assemblies. (b), Each Congregational church acknowledges no superior on earth (Winthrop’s Journal, 57), Colony Laws, 101. Congregationalists also differ from Presbyterians in the mode of admission into the church. They generally require written or oral declarations of faith and religious experiences. Mass. Hist. Coll. IX. 16, n. (c) Some Congregational churches also differ as to baptism, denying it to all but children of believers in full communion ; others require a sort of half communion.. To conclude what *29 1 have to say on church government, the Episcopalian Church is monarchical, the Presbyterian aristocratical, (a) and the Congregational democratical. (b)
(8.) In worship there is little difference between the two sects. But still there is some. In the administration of the Lord’s Supper the Presbyterian mode is reckoned the most solemn. Many Presbyterians esteem the difference as matter of consequence, though perhaps few carry it so far as the present plaintiff. He thinks it important that the bread should have no leaven in it. Even this seems to be of as much consequence as one of the stumbling-blocks to the Puritans, and which was one of the causes that led to the separation from the Episcopal Church, —- the matter of the altar, and the garments worn by the priests on these occasions.
5. From this very brief view of the two sects, I think myself warranted in saying that Presbyterians and Congregationalists differ from each other as much at least as Baptists do from either, (c)
*30 They were distinct sects and formed separate religious societies at the time our Constitution was made. And I am confident if it had then been understood that they were not to be so considered, no Presbyterian would have assented to that instrument. The Constitution, in using the words persuasion, sect, or denomination, no doubt had reference to the sects at that time in being. Episcopalians, Baptists, Quakers, were, at that time exempt. I do not know that the question at that time had arisen respecting Presbyterians. (a) Perhaps it would be going too far to say that these words shall not be construed to extend to sects that may spring up in future. When they arise and become distinctly marked, they will doubtless be entitled to claim the privilege of exemption.
From the construction now given to the Constitution, I apprehend that it will follow that towns and parishes are authorized to tax atheists, deists, revilérs and contemners of religion, and persons of no religion at all, and who consequently belong to no particular denomination of Christians. It is only persons of a religious sect that are under any circumstances exempt from taxation in the corporate body to which they belong. And in this case the public are supposed to suffer no loss from the exemption, because such persons maintain religious instruction according to their own persuasion; but' this will not apply to those who have no religion. (b)
VI. It has been said that Presbyterians and Congregationalists agree in many things; that they differ only in *31 trifling matters; and that they often unite in worship and communion, (a)
It is true they agree in many things. So do all sects. It is sufficient that they differ in such matters as are deemed by themselves essential. It is sufficient that many serious Christians of both these denominations cannot overcome their scruples; cannot give up their preference for the order, discipline, worship, and government of the church, which prevails in their own sect, and constitutes its difference from all others.
Dissenters in England (b) are allowed to say that they cannot in conscience join the Established Church; that they cannot take the sacrament according to her rites and ceremonies. The substance of the thing is the same among all Protestants. Our Constitution allows all sects to say the same of each other. Where the denomination is different, and they do not in fact unite, they shall not be compelled to pay. Each sect has a right to prefer its own form, and each individual of the sect to appropriate his money to the support of public instruction in religion and morality in his own society. It must not be permitted to the prevailing sect to say, “ Those who differ from us do it upon matters of indifference, or for no reasons.” The majority have no *32 right to judge in this matter. It is no matter.whether the points in difference between sects be great or small, as long as the parties concerned think them of sufficient consequence to induce a separation, (a) All the Protestant churches set out together, but they parted on the road. They fell out by the way. And yet, if we coolly and impartially examine the points on which they differed and separated, they will be found few in number and trifling in amount.
It is true Presbyterians and Congregationalists (b) have been for some time approximating towards each other, but they have not yet formally united. Both sects have increased in Catholicism, all sects are approximating, the shades of difference have, been for some time gradually wearing away, and a more liberal way of thinking generally prevails, (c) There have been times .when toleration was reckoned among the number of the deadly or mortal sins. (d) He who be *33 lieved. that he had the command of God to extirpate heresy would not suffer the execution of the divine will to be retarded by the weakness of humanity. But the laws of humanity at length triumphed, and toleration came to be considered as a duty. With us it is exploded, for it implies an establishment which we have not. Here the doctrine of toleration has given place to the most perfect equality of rights. If this system of ours is suffered to remain for any length of time, I should hope that discordant sects may in time be brought to assimilate, and then to unite, (a)
Our Constitution has a tendency to produce these effects, as far as human means can accomplish it. Force, however gentle, has no tendency to unite. (b) It will produce a contrary effect. It is of the nature of the human mind to revolt at compulsion. Men have in all ages suffered martyrdom for what appear to be the merest trifles. It is the usual effect of persecution (and though the present question does not involve the rights of conscience, yet many suppose they are involved), it is the usual effect of what is deemed persecution, and every species of oppression, to harden and contract the will, (c) to inflate and inflame the imagination, *34 to magnify trifles into matters of importance. Zeal becomes ardent, then rancorous. When the current of zeal and devotion is contracted into a narrow channel, it runs with the strength, and sometimes with the fury, of a torrent. It provokes persecution, and the furious zealot expires in the flame his own zeal has kindled. But from the ashes of every martyr, — whether a victim to the truth or to error, whether to great or to 'Small things, —spring up a thousand ready to encounter the pains for the crown of martyrdom. Policy, therefore (though, as a judge, I disclaim being influenced by it), policy dictates that we should not hurry the good work of Catholicism and union of sects. This zeal too much resembles the profane and impious zeal of the Hebrew priest, who must needs put forth his hand to guide the ark. The greatest bigot I ever knew, was a bigot to freedom of inquiry, — illiberal in favor of liberality, and uncatholic towards all who were not as catholic as himself.
In this country there is perhaps less difference in the actual government and discipline of the Presbyterian and Congregational Churches, than what appears in their platforms. Still, there is a difference in practice. In judging of the s'ects, we are not to compare the lax administration of the systems, but the systems themselves. This would be like judging of a work by a spurious impression, one which the author himself disavows; like judging of an original by a bad copy. It is the same error which infidels have fallen into, — ascribing to the Christian system the faults of its unworthy professors. (a) Mild as the present times are, liberal as I know *35 Mr. Barnard and the respectable members of his society are, still I believe they have no fancy to go over to the plaintiff’s sect. They prefer their own. They think it most agreeable to Scripture. They are willing the plaintiff should come to them, but do not choose to go to him. But, if he is really and truly a Presbyterian, he has a right to remain where he is, and to enjoy his own peculiarities while they enjoy theirs, (a)
VII. To recapitulate.
The Constitution secures the citizens of this State against persecution on account of their religious opinions and religious worship.
It provides that religious opinions shall in no case form any ground of civil distinction, declaring that all men are equal in the sight of the law, and equally eligible to civil honors and offices.
It provides for public instruction in religion and morality, because they promote the good of society; and declares that it can only be maintained by authorizing towns, in their corporate capacity, to support and maintain it.
It exempts persons who are really and truly of a different denomination from the majority of the corporation from paying towards the support of the teacher elected by the corporate body. It leaves them at liberty to apply their means towards the support of public instruction in religion and morality according to their own persuasion, which is supposed to be equally useful to society.
From the pleadings in this cause it appears that the plaintiff is a Presbyterian, and the First Parish in Amherst, Congregationalist.
*36 These are different sects, because they differ in church government and discipline, though they agree in doctrines.
The consequence of all which is, that —
The demurrer must be overruled, and the plaintiff must have judgment on the second count (a) , [1]
Judge Livermore, of that opinion.
Judge Wingate, of a different opinion.
Judge Atkinson, not present.
Judge Farrar,
who heard the arguments, fully agreed with the majority of the Court, but had resigned his seat before judgment was given.

 A large portion of the author’s notes to this opinion were evidently made after the delivery of the opinion, and after it had been copied into the manuscript volume from which it is now printed. The blank leaves of the manuscript seem to have been used as a sort of commonplace-book, in which to record references to, and extracts from, later reading, not always sustaining the text. The notes so made are of unequal value; and, if the manuscript had been revised by the author with a view to publication, some notes would probably have been omitted, and others condensed. A few of these notes have been omitted in the present publication.

 4 Belsham, Geo. III. 264, 265. No man ought to he molested on account of his opinions, not even his religious opinions, provided his avowal of them does not disturb the public order.
The law ought only to prohibit actions hurtful to society. Articles Y. and X., French Declaration of Eights, 1789.

 Conscience is the royalty and prerogative of every private man. He is absolute in his own breast, and accountable to no earthly power for *5 that which passes only betwixt God and him. Those who are driven into the fold are, generally speaking, hypocrites, rather than converts. 1 Dryden, 234, preface to Hind and Panther.
Of all the tyrannies on human kind,
The worst is that which persecutes the mind.
1 Dryden, 240.
40 Monthly Review, 650. The most deplorable degree of slavery is the subjection of opinion, &e.

 Protestants have conscientiously become Catholics. This was the case with George Calvert, first Lord Baltimore. Upon his conversion, he resigned his office of Secretary of State. 2 Belknap, American Biography, 364.

 See 67 Monthly Review, 15.
Strange legislation, to make the exercise of the understanding penal. Impolitic and unjust. 21 Edinburgh Review, 182.

 To destroy people for points of mere speculation, and which have no ill effects on practice and civil government, seems very remote from the spii'it of Christianity. Supposing truth on the persecuting side, yet to burn a man, because he will not belie his conscience and turn hypocrite, is strangely unaccountable. Men cannot believe what they please. Their understandings are not all of a size. Things do not stand in the same light and strike with the same force on everybody. Besides, if the persecutors believe the persecuted will be so ill received in the other world, why do not they use them better in this? Why do they hurry them to eternal destruction before their time ? Such wisdom does not proceed from above It is earthly, sensual, and devilish. Collier, 2 Rep. 48, n. 6. See 1 Lord Erskine’s Speeches, 307.

 They alone who abhor toleration deserve little. They are enemies to the freedom of religion, over which God alone can have any right of empire. Horace Walpole, Works, II.; 5 Senator, 785, &c.
JReligionem imperare non possumus, quia nemo cogitur ut credat inviius. Theodcric. 68 Monthly Review, 71.

 An Act of Parliament passed (1 Rapin, 827), declaring that whatever the King should enjoin in matters of religion should be believed and obeyed by all his subjects. 1 Rapin, 829.

 It is the interest of a despot to have but one religion in his dominions, because it is his interest that there should be none. 67 Monthly Review, 14.
It is not in the power of men to believe what they please; and, therefore, I think they should not be forced in matters of religion, contrary to their persuasions and their consciences. I wish all good men were of one mind. However, in the mean time, I would have them live peaceably and love one another. Mass. Hist. Coll. I. 251; 14 Edinburgh Review, 372, 397; Queen Mary, 1689.
God above alone can look into the heart; and man, could he look into it, has no jurisdiction over it, until society is disturbed by its actions. 1 Lord Erskine’s Speeches, 422.

 31 Henry VIII. cli. 14; 1 Rapin, 821,822; Cooper’s Justinian’s Institutes, 633, 663; 1 Haz. Eloq. Brit. Sen. 406 ; 67 Monthly Review, 15.

 An absurd attempt was made in Salem, 1631, to introduce uniformity in dress, wearing of veils. Mass. Hist. Soc., 1799, VI. 245, 258.
46 Monthly Review, 77. It is difficult to determine whether the principle of religious persecution be most wicked or most weak. Calvin, imagining Servetus to be wandering in the darkness of error, seems to have concluded that no light could so surely guide him to the truth as that of a bonfire, in which the convert himself was to be the principal fagot. How abominable, and, at the same time, how absurd !
He that’s convinced against his will,
Is of the same opinion still.
Hudibras.

 Mr. Pox. 4 Belsham, Geo. III. 364.

 They who tell us that the days of persecution and superstition are past, and that we shall never see any more of them, pay too high a compliment to human nature. The same poison still subsists, though it does not appear so openly. Some symptoms of this plague break out from time to time, enough to infect the earth. Yoltaire, 1742.
See 5 Burke’s Works, 202, 205, 207; T Brit. Cicero, 132; Burke’s Speech to the Electors of Bristol, 1780.

 The simple and effectual expedient of permitting the different sects in religion to. profess and enjoy their opinions with equal freedom was, in the time of Henry IY. of Prance, 1598 (at commencement of seventeenth century), and long after, untried in practice, and almost unknown in speculation. The toleration of error and the permission of crimes were treated alike. Mackintosh, Rev. 1688, 224.

 The provision in this article, according to what has been just stated, *9 is considered in England, by all parties and sects, as securing the rights of conscience in the most ample degree. 4 Belsham, Geo. III. 126.
Mere opinions ought not to be punished by the civil magistrate. Loud Mansfield, Blackst. Appendix, 145-152 ; Cowper, 383-393; 4 Belsham, Geo. III. 215, 280, 364; Articles Y. and X., French Declaration of Bights, 1789; 2 Anach. 364, 365, &c. '
(Contra. 2 Boswell’s Life of Johnson, 105-113; 3 Boswell, 363 ; 64 Monthly Beview, 499-503; New' England Platform, Wise, 228.)
Blackst. Appendix, Furneaux Lett. 27, n.; Dr. Tucker’s Bemarks on Parsons, 8, &c.; Private Opinions, 33 Monthly Beview, 554.
Voltaire. The only case in which intolerance is justifiable by human laws is wdien the errors of a people become criminal. Government hath then a right to punish them. They become criminal only when they disturb the peace of society and inspire fanaticism. No fanatics of any religion can lay claim to toleration. 30 Monthly Beview, 531.
Mannontel, Speech, II. 196. In religion, thought is absolutely free, for it appertains to man in his relation to God.
Action in worship is but conditionally free, for it appertains to man in society. It may be restrained when it disturbs the public tranquillity.
Beligion is an innocent thing, &e. 17 Edinburgh Beview, 394.

 There is a small deviation from this liberal doctrine in the Constitution, where it is provided that Governor, Councillors, Senators, and Representatives shall be of the Protestant religion.* There is no religious qualification as it respects electors.
See Mr. Pitt’s speech in favor of excluding Dissenters from offices. 4 Belsham, Geo. III. 124, &e.

 Article VI., French Declaration of Rights, 1789; 4 Belsham, Geo. III. 265.

 Atheism. Lord Mansfield (Blackst. Appendix), Speech, 145, 152; Bishop of St. David’s (Dr. Horsley), 4 Belsham, Geo. III. 220.

 Judge Smith, in the Constitutional Convention of 1791, voted in favor of expunging the Protestant test. Journal of Convention; 10 Provincial and State Papers, 46. The test was finally abolished by the constitutional amendments adopted in 1877.

 47 Monthly Review, Sept. 1772, p. 238; Dr. Kippis, 47 Monthly Review, 105; 67 Monthly Review, 15, 6, 7; 3 Senator, 585.

 The Statute of Feb. 8,1791, § 10, enacts that the inhabitants of each town, at any legal meeting, “may, agreeably to the Constitution, grant and vote such sum or sums of money as they shall judge necessary for the settlement, maintenance, and support of the ministry, schools, meetinghouses, school-houses, ... to be assessed on the polls and estates in the same town, as the law directs.”
The Provincial Statute of May 14, 1714, empowered towns to choose ministers, and raise money by taxation for their support: ‘ ‘ Provided always, that this act does not at all interfere with Her Majesty’s grace and favor in allowing her subjects liberty of conscience; nor shall any person, under pretence of being of a different persuasion, be excused from paying towards the support of the settled minister or ministers of such town aforesaid; but only such as are conscientiously so, and constantly attend the publick worship of God on the Lord’s day, according to their own persuasion, and they only shall be excused from paying towards the support of the ministry of the town.”

 And yet a law which should tax the State, ail sects and denominations, for the support of religious worship according to the articles and tenets of one sect alone, would be considered as altogether oppressive and intolerable; in the same manner as a tax on the whole people to educate the children of Congregationalists alone. See 21 Edinburgh Review, 211.

 See, on this subject, 17 Edinburgh Review, 6.
Toleration. See 17 Edinburgh Review, 394, and above reference.
5 Senator, 785.
Establishment. 5 Quarterly Review, 352.

 3 Senator, 585. The experience of past centuries and the contemplation of present times prove that religionists of all descriptions may he equally good subjects. 40 Monthly Review, N.s. 150.

 Compare Parsons, C. J., in Barnes v. First Parish in Falmouth, 1810, 6 Mass. 401, 408, 409.

 The celebrated Mr. Locke, in framing a Constitution for the Carolinas, allowed the Church of England a maintenance by Parliament (of the Colony). 1 Holmes, American Annals, 408, n.

 See Richardson, C. J., in Baptist Society v. Wilton, 1822, 2 N. H. 508, 512.
The Congregationalists, although at that day often in the majority, were not so in every town. Sometimes “the tables were turned.” See instances cited by Doe, J., in Hale v. Everett, 1868, 53 N. H. 9, 148, 149.

 3 Boswell’s Life of Johnson, 359. Dr. Johnson says: “My friend, Tom Cuming, the Quaker, in 1745, said he would not fight, but he would drive an ammunition wagon. And we know that the Quakers have sent flannel waistcoats to our soldiers, to enable them to fight better.”
1 Minot, 235. Pennsylvania, under the influence of the pacific principles of the Quakers, in 1755, declined furnishing troops for the war, hut voted to raise £10,000, to be expended in provisions for the use of the forces raised by the other colonies. “ They were willing to furnish stomach ammunition, — the materiel of all battles and bloodshed they cause others to fight.” Slat. Gaz., Oct. 15, 1825.
35 Quarterly Review, 226, n. Quaker casuistry, a notable instance.

 The good Mr. Vane could not in conscience dine with Governor Winthrop in company with Lord Ley. Winthrop’s Journal, 133.
It is the opinion of some that it would very much enlarge and establish liberty of conscience, that great bulwark of our nation, if the Christian religion should be abolished. 3 Swift, 114, Argument against abolishing Christianity. See id. p. 124.

 2 Belknap, American Biography, 248, Life of Governor Bradford Certain persons excused themselves from working for the public on Christmas Day, on the score of conscience. In the course of the day, the Governor found them at play. He commanded the instruments of their game to be taken from them. At the same time, he informed them that it was against his conscience to suffer them to play while others were working for the public.
There is nothing which has not, at some time or other, been used as a pretext of the conscientious kind.
The rioters in London, in 1780, pretended to be actuated by religious motives; the outrages they committed were all in defence of the Protestant *16 religion. It went against their consciences that the Roman Catholics should enjoy the liberty of conscience. 1 Pol. Mag. 504; 2 Boswell’s Life of Johnson, 105-113.

 Mass. Hist. Soc., 1795, pp. 135, 222; 3 Senator, 140.
The subjects of these colonies (Massachusetts, Plymouth, New Haven, and Connecticut, including New Hampshire) are of the same faith and belief, in all points of doctrine, with the Church of England and other reformed churches, though not alike persuadéd in some matters of order, &c. Mass. Hist. Coll. I. 175. The synod which framed the New England Platform of Church Discipline recommended to the General Court and the churches the Westminster Confession of Faith. Mass. Hist. Coll. VII. 25; Mass. Hist. Coll. IX. 40, &c. See 1 Holmes, American Annals, 345, 484; Winthrop’s Journal, 194.

 This is expressed too strongly. All are required to subscribe; some refuse. 47 Monthly Review, 102.

а) 1 Doug. 440, says tho Synod at Cambridge, N. E., 1648, agreed to the 'Westminster Confession of Faith of 1646, in matters of faith and doctrine, but composed a platform of their own for discipline.
In 1680, the Confession of Faith nearly the same with that of the Independents in England, called the Savoy Confession of Faith (Oct. 12, 1658), and seemed to renounce the models of Geneva and Scotland. See id. 442, not different in doctrine, but church government, &c.
Plymouth Colony address to Charles II , Chalmers, 105,106, agreeing in doctrinal points of religion with the profession of the Church of England and other reformed churches, &c.

 Dr. Tucker, in his remarks on Mr. Parsons’s sermons, in which the latter had spoken of Calvinists as a denomination, says, This is the first time I over heard of them as a distinct sect or denomination of Protestants.

 Forms, ceremonies, &c., of the Church of England caused the settlement of New England. See 1 Hubbard, 154, &c. “ Conscience in point of God’s worship ” was the main end of coming here, — those of different persuasions respecting church government cannot join us, &c. Morton’s Mem. 418.
“ Sects, in England, are formed by reason of disagreement in points of discipline and external forms of worship.” Middleton on Miracles, cxiii. The Church and dissenters agree on essentials, and differ only about things indifferent. Id.

 Blackst. Appendix, 151.

 But merely worshipping with other denominations occasionally, and even conforming to their rites, is not evidence that the person is insincere in his profession. The famous Baxter, a Presbyterian, who refused the bishopric of Hereford, 1661, frequently attended divine service in the Church of England, went to the sacrament, and persuaded others to do the same. 2 Rapin, 744, n. 4.

 Lord Mansfield, Blaekst. Appendix, 145-152.

 The original Congregationalists have always held that the distinguishing character of sect is polity, not doctrines. 65 Christian Examiner, 200; Lamson’s Dudley Lecture.

 1 Gibb. 460; 2 Rapin, 363.

 1 Gibb. 467, 503. If mere difference in doctrine should exempt any, it should be Unitarians. Blackst. Appendix, Priestley to Blackstone, 17, n.

 Presbyterians and Independents spoken of as distinct sects. 1 Holmes, American Annals, 442, 448, n.
X. Lingard, 158, &c. Principles of Presbyterians and Independents essentially different.

 Province Laws, p. 55; Temporary Laws, 49, 50. in 4 Belsham, Geo. III. 218, it is applied to Methodists, Dissenters, Churchmen.
2 Kapin, 742, n. 6; 1 liapin, 849; 1 Dryden, Preface to Hind and Panther, 235.

 1 Rapin, 322; 67 Monthly Review, 13.

 See Hubbard, I. ch. 28, p. 182, 183, &c.; 2 Hubbard, 415, 416.
Id. 418. “ A Presbyterial spirit” was a term of reproach, as excluding the brethren.

 So do Calvinists, &c. Now and then we find a Calvinistic society in the country.
That Universalists are not a distinct sect from Congregationalists must now he considered as settled by the decision in Henderson & Peckham v. Erskine, in error, Cheshire, October Term, 1802.
In the nature of things there is no more ground to exempt Universalists than Arminians from paying towards the support of a Hopkinsian teacher.

 See 18 Quarterly Review, 428; peculiarly fitted for Scotland.

 Rapin considers Independents as springing from the Presbyterians. Indeed, he uses the word Presbyterian as a general term in opposition to Episcopal. 2 Rapin, 352, 514, n. 1.

 See Mass. Hist. Coll. V. 206. Origin of Congregational Churches.
See Origin of Congregationalism, Mass. Hist. Coll. VII. 265.
Separation from Episcopal Church. Mass. Hist. Coll. IX. 101.

 Mass. Hist. Coll. IX. 171; 1 Holmes, American Annals, 95, n., and 483.

 Mather’s Magnalia, III. 157; 19 Quarterly Review, 91.
See First Formation of Congregational or Independent Churches. 1 Mass. Hist. Coll. I. n. s. 165, 166. See id. 200, ante and post. Congregationalism. Id. ix., Davis’s Disc.
1 Heart of Mid-Lothian, 90. “ The air of Scotland was alien to the growth of Independence, though favorable to fanaticism under other colors.”
The Presbyterian Church seems no better disposed to Congregationalism than the Episcopal.

 42 Monthly Review, 27; 19 Quarterly Review, 91, 95. The grounds of dissenting at this day. 47 Monthly Review, 102, 103, &c.; Mass. Hist. Coll. IX. 10-12, &c.; McCrie’s Life of Knox, 82, 83, 427, 1 Neal’s Hist. Puritans, 108, 568-570. The Council ordered the altars to be removed from the churches (as the retaining them would serve only to nourish in the minds of the people the opinion of a propitiatory mass), and tables for sacramental occasions to be used in their stead. Day, Bishop of Chichester, and Heath, Bishop of Worcester, refused to comply, insisting on the Apostle’s words, “We have an altar;” and, rather than comply, they suffered themselves to be deprived of their bishoprics for contumacy. Oct. 1551.
See vindication of this, 1 Neal, 568-570, and 108, after the above passage.

 The Brownists spoken of as a sect. 2 Rapin, 471; Mass Hist. Coll. IX. 10, 11, &c., n.

 Mass. Hist. Soc. 1795, IV. 134; Mass. Hist. Soc. 1800, VII. 265, &c.
Congregationalists; origin of name. 1 Holmes, American Annals, 271.
(It would seem this account is not correct. See 1 Holmes, American Annals, 484.) Puritans. 1 Holmes, American Annals, 240, 243. It is not easy to say what they were; but they were non-conformists, some more and some less hostile to the Church; perhaps none of the Brown sect, at least they ceased to be so long.
See Robbins, New England Fathers : Brownists, 43, 120, 125, 139; Independents, 43, 122, 128; Savoy Confession, 128.

 As to the rise of the Independent sect, see 2 Rapin, 514, and n. 1.

 An attempt was made before 1648 to introduce t.ie Presbyterian government and discipline in one of the Now England churches. This was almost as opposite to the principles of the fathers of New England as the Church of England. Mass. Hist. Coll. IX. 48; 1 Holmes, American Annals, 339; 2 id. 72, 73.
Origin of Congregationalists in New England. 1 Holmes, American Annals, 95, 190, 484.

а) Encyclopedia; “Independent.” New England Platform; Wise, &c.; Mass. Hist. Soc. 1794, 67, 68; Mass. Hist. Soc. 1799, VI. 242, 260; Bentley’s History of Salem.
As to the elders, who usually assisted in ordination, see History of Salem, above.
Winthrop’s Journal, 95, 96; Mass. Hist. Soc. VII. 1800, 265, 272.

 Mass. Hist. Coll. VI. 242, &c„ 260 ; VII. id. 125.
It seems ministers who had been before ordained were ordained over again. Mass. Hist. Coll. VII. 125; and Bentley’s History of Salem; Mass. Hist. Coll. VI.passim; Winthrop’s Journal, 123, 124.
Sed vide, Mass. Hist. Coll. IX. 12, &c.

 How a church is formed. See Mass. Hist. Coll. VII. 14, 15, &c.; Mass. Hist. Coll. IX. 192,193.
Ordination by the brethren of the church. Mass. Hist. Coll. VII. 39. One ordained by a bishop ordained again as a Congregationalist.
See President Stiles’s Election Sermon, 2d ed. 103. Ordination. *27 Mass. Hist. Coll. IX. 3, 39 ; 1 Holmes, American Annals, 198, 199, 250, 251, 308, 309, 315, 354, 372. 1 Hazard’s Collection, 490.
There is this difference (in ancient times at least) between Congregationalists, and Episcopalians and Presbyterians. In the two latter, ordination does not connect a man with a particular church; with the former it does; the consent ol the people is every thing; at first the church was every tiling; since the town consent. It seems the establishment of a new church does not affect the contract made by the old with a minister, and it seems consent of the town is now necessary to dissolve ministerial connection (unless perhaps where there is the advice of council to authorize the church to do it.)
Mass. Hist. Coll. IX. 135, 139; badly reported.
Ordained minister connected with a church, but not congregation — common. Mass. Hist. Coll. IX. 156. How church formed. Mass. Hist. Coll. IX. 154. Locality of a church. 2 Holmes, American Annals, 33, 34, 42.
Winthrop’s Journal, 213. A church in early time, 1640, might ordain a pastor privately; but the common practice then was to give notice oí tlio ordination to the neighboring churches and to the magistrates. This latter is now disused. Wiuthrop’s Journal, 268.

 Encyclopedia; “Independents.” Wise, 206, 209, 221, 224.
This is that which principally characterizes the sect. 2 Rapin, 514, and n. 1.
Mass. Hist. Coll. IX. 14, 15.
Some say the Congregationalist is a middle way between Presbyterians and Brownists.
Wherein Congregationalists differ from others. Mass. Hist. Coll. IX. 15, &e.

 And each contends that his form of government, Episcopal and Presbyterian, is most suitable to the word of God andyure divino. 2 Rapin, 510, n. 1; id. 573.
Congregationalists have synods, but they have no authority, &c. Mass. Hist. Coll. IX. 32.
Independency. Minister's ordained over again; members dismissed from one. church received into another in the same manner as if they never had been members of any church. Winthrop’s Journal, 64; passim, 95.

 1696-1717. The church of Cambridge voted that a formal and public relation of religious experiences as a qualification for church fellowship was unnecessary. Mass. Hist. Coll. VII. 32; Mass. Hist. Coll. IX. 3. See Winthrop’s Journal, 166, 167.

 Republican. 27 Edinburgh Review, 335.

 The Scriptures do not lay down any precise rules as to the arrangement of public worship, the form of church government, discipline, &c. It is not, therefore, wonderful that persons professing to take the Scriptures as their guide should entertain different opinions on these subjects.
5 Quarterly Review, 334, calls Presbyterian establishment a republican government.
18 Quarterly Review, 429; 4 Burke, 112.
2 Burnet, Own Times, 406, 407.

 And as much as Presbyterians differ from Episcopalians.
Few foreign Protestants (Presbyterians) scruple to communicate with the Church of England. 2 Rapin, 784, 804.
The hierarchy is the principal point on which Presbyterians and Episcopalians are divided. 2 Rapin, 802, 805.
Mather’s Magnalia, passim, et 13, 14, 20; N. H. Hist. Coll. I. 77; Penhallow.
See Heart of Mid-Lothian. Presbyterians hold that the General Assembly represent the Head of the Church, and have the sole and exclusive right of regulating whatever belongs to public worship. There is the jus diriman of Presbytery as well as of Episcopacy. Independents will not admit that any assembly of churchmen have any coercive power.

а) It has since arisen in the case Steele v. The Assessors of Hillsborough, and it was then the unanimous opinion of the Court, in their direction to the jury, that Presbyterians were a different sect from Congregationalists.
The jury found for the defendants; it is presumed on the ground that Steele was not a real Presbyterian, but a pretended one ; such was the weight of evidence.

 In England the penal laws are in force as it respects persons of no religion. The toleration only extends to such serious, sober-minded dissenters as shall have taken the oaths and subscribed the declaration required, and who shall regularly repair to some registered place of public worship. Blackst. Appendix; Answer to Priestley, 40.

 Dr. Tucker (remarks on Parsons’s Sermons, 8) says Presbyterians and Congregationalists differ but in smaller matters, in which they can bear with each other, and often do, peaceably uniting in the same religious society.
See also Hew York Review, V., 90; McCrie’s Life of Knox, 124.
The more sober and learned Puritans inclined to that form which is known by the name of Presbyterian, &c. Robertson, History of America, 144.
First settlers of Hew England not Brownists : id.; though agreeing in many things, Brown went further and was out of credit in 1680; though Robertson seems to consider them as Brownists, 153, 189. If Brownists, it was in a milder form. The settlers at Plymouth and Boston were evidently different, though both had imbibed Puritanical notions. Robertson says they were Puritans of the strictest form, 158. Some of the number retained a veneration for the ritual of the church. Id. 159.

 Lokd Mansfield, Blackst. Appendix, 150.

 Who has not seen Congregationalists commune with Presbyterians; and, instead of sitting at a table in the true Presbyterian mode, take the elements in a pew ? This is said to be the case with Mr. Adams, at Dr. Green’s, Philadelphia. In Pembroke, the same minister governs one part of his society in the Presbyterian, and the other in the Congregational, mode.
Presbyterians in Scotland make no scruple in communicating with the Church of England. 3 Senator,-141.

 Presbyterians and Congregationalists considered as distinct sects at early times in New England. Connecticut, 1680. Mass. Hist. Coll. IV. 222. Mass. Hist. Coll. IX. 47. Presbyterians not allowed even to hold lands.
There has been a time when members of the Church of Scotland have been refused communion in the New England churches. Mass. Hist. Coll. IX. 47.
An attempt was made, in 1643, to establish Presbyterian government at Boston, under the authority of the assembly of divines at Westminster, but it was baffled by the General Court. 1 Holmes, American Annals, 328; 1 Hutchinson, 112. See 1 Holmes, American Annals, 469. Episcopal worship against the conscience of Congregationalists in their meeting-houses. See 2 Holmes, American Annals, 486. Congregationalists inimical to Presbyterian government. Winthrop’s Journal, 57.

 “ The bitterness of sectaries against sectaries exceeds all common wrath.”

 19 Quarterly Review, 92-97. Toleration is a new virtue in any *33 country ; 5 Burke, 154. Toleration is odious to the intolerant; freedom to oppressors; property to robbers; and all kinds and degrees of prosperity to the envious. Burke; 1 Brit. Cicero, 158, 159.
Toleration. 2 Brit. Cicero, 67, &c.

 If they should never unite, they may perhaps be as useful apart. See 21 Edinburgh Review, 181.

 See 3 Shaft. 88; 4 Burke, 113; 1 Haz. Eloq. Brit. Sen. 406.

 It was enacted bylaw, in France, that, if any Jew embraced Christianity, he forfeited all his goods. I am inclined to think that such a law would be more likely to make converts to Christianity than a law declaring that all who remained Jews should incur the same forfeiture. 2 Hume’s England, 227, 237. 1 Haz. Eloq. Brit. Sen. 406.
The diseases of the body may be sometimes cured by salutary violence, but neither steel nor fire can eradicate the erroneous opinions of the mind. The reluctant victim may be dragged to the foot of the altar, but the heart still abhors and disclaims the sacrilegious act of the hand. Religious obstinacy is hardened and exasperated by oppression. 2 Gibb. 308. See 19 Edinburgh Review, 155, 160.
Louis XIY., finding his persecution of the Protestants ineffectual, de *34 sired Fénélon to try if lie could not convert them with his preaching. “That I will, with all my heart, Sire,” replied the Archbishop, “if you will be so good as to call off your dragoons, for ’tis they that drive them so much farther from us.” Spence’s Anecdotes, 29.

 The question is not what some persons calling themselves Presbyterians think and do, but what the great body of religious men, who conscientiously adopt and adhere to this sect, and firmly believe in the great importance of the points in which this sect of their choice differs from all ’ others, think and do. See 32 Edinburgh Review, 108.
There are catholic, liberal-minded Presbyterians, and there are Presbyterians who care as little about religion as about the difference of sects.

 McCrie’s Life of Knox, 124. See 3 Brit. Cicero, 424.
One man has no right to touch the religious prejudices of another. 27 Edinburgh Review, 337.
The Presbyterian, in his tenets, differs slightly from the Church of England ; the Roman Catholic differs greatly. But to the conscientious believer in the superior purity of his own persuasion, the smaller step (to coalesce) is not less impossible than the greater, &c. 61 Edinburgh Review, 262.

 See, as to religious establishment, toleration, persecution, 17 Edinburgh Review, 6. See also 19 Edinburgh Review, 149-164.
Note. Origin of Dissenters, 15 Swift’s Works, 18mo ed. 132.
Mr. Hollis (donor of Harvard College) appears to have considered Presbyterians and Congregationalists different sects. See 1 Art. Morse, 10. So the College considers them: Presbyterian ministers are not overseers.
Establishments in religion; 5 Senator, 742. Toleration, 1 Belknap, 82. See Methodists, 2 Wendeborn’s View of England, &c., 229, 233, 258, 260-263.
Origin of Presbyterianism, 1 Hooker, Eccl. Pol. 135, ante et post, and 141.
There will be a time when three words uttered with charity and meekness shall receive a far more blessed reward than three thousand volumes written with disdainful sharpness of wit (i.e., in different spirit from that of meekness and charity). 1 Hooker, Eccl. Pol. 142.
In New England the doctrines of Westminster Confession of Faith always regarded highly, but the divine right of Presbyterian government with greater unanimity. 2 (Sav.) Winthrop, 77, n. (1). See Id. 91, fear of Presbyterianism. See Id. 137, “ Mr. H., being of a Presbylerial spirit, did manage all affairs without the church’s advice, &c.” Winthrop, II., 235-249, 330, n., 331.
Wise, 19. The ref. [reformation ? ] in King Edward’s time good ; of Geneva and Scotland, better. But the Congregational way far exceeds them all in purity, is the highest step towards reformation, and *37 for the substance, is the same that was established and practised in primitive times, according to the institution of Jesus Christ. President Coke’s [?] Sermon.
Wise, 104. Difference between Congregationalism and Presbyterianism. Id. 172. Mass. Hist. Coll. IX. 48.
[Notes have been omitted which contain references to the following : — ■ 2 Aiken’s Eliz. 05; 1 Millar’s Account of Presb. and Indep. 130; 2 Hooker, Eccl. Pol. 268; Library Useful Knowledge, No. 199, 36; 1 Aiken’s James I. 57; Eliz. 189; Mackintosh’s Rev. 1688, 285, 286, &c. IX. Lingard, 10, &c.]

 In Henderson et al. v. Erskine, defendant in error, Cheshire, October Term, 1802, 3 Manuscript Reports, 33 (also 'cited in Universalist Quarterly for April, 1876, 154-160, and for July, 1876, 161-163), Caleb Ellis, counsel for Erskine, proposed to argue that “ Universalists and *37 Congregationalists are different persuasions, secis, or denominations.” “But, being informed that the Court had, upon full consideration, decided this point against him, he waived it,” and argued another point. The action was brought to try the validity of a tax assessed on Erskine, a Universalist, for the salary of a Congregational minister. The decision of the Court of Common Pleas, at April Term, 1801, in favor of Erskine, was reversed in the Superior Court, at October Term, 1802, by Parkae and Livekmoius, JJ. Wingate, J., was absent; and Smith, C. J., did not concur, because he doubted whether the plaintiffs in error had taken their objections in the proper form. The previous decision, referred to by the Court in Henderson v. Erskine, was undoubtedly made before the appointment of Judge Smith. This appears from the following certificate by his predecessor, Chief Justice Oecott, which is among the papers in Henderson v. Erskine (and evidently refers to a prior case).
“ I certify that it has been settled by the Superior Court, that persons called Universalists are not such a sect, persuasion, or denomination as by the Constitution of New Hampshire are exempt from the payment of taxes for the support of a regularly settled minister of a Congregational Society in the town where such persons live. And I think that, in establishing this practice, the Court were[1] Unanimous.
April y° 3d, 1801. Simeon Olcott.”
“ Those decisions were manifestly wrong in this : they were based solely on the indisputable proposition that Universalists are Congregationalists, in disregard of the two other propositions, equally.indisputable and equally important, that Universalists are one of several Congregational sects, and that religious liberty is the object of the constitutional provision. In 1804 the Freewill Baptists, in 1805 the Universalists, and in 1807 the Methodists, applied to the Legislature for relief from the tax-paying consequences of being held not to be religious sects distinct from the Puritans, and procured the passage of resolutions declaring them to be religious sects entitled to the constitutional privilege. Whether they were religious sects within the meaning of the Constitution, or not, was a judicial and not a legislative question; but, by the unconstitutional and void resolutions of the Legislature, the erroneous decisions of courts, *38 juries, towns, and town officers, were practically reversed. ” Doe, J.,in Hale v. Everett, 1868, 53 N. H. 9, 138.
The power given to towns, by the act of Feb. 8, 1791, to raise money by taxation for the support of the ministry, was taken away by the so-called “ Toleration Act ” of 1819 (Laws of 1819, c. 76), excepting so far as was necessary for the fulfilment of contracts then existing. As to the passage of the “Toleration Act,” see reporter’s note in 55 N. H. 468, 469. Besides the references there given, see, generally, as to taxation for the support of the ministry, Life of William Plumer, 185-187 ; Life of Isaac Hill, 44, 52; Sanborn’s History of New Hampshire, c. 79; Doe, J., in Hale v. Everett, ubi sup. 148, 149.
In The Dublin Case, 1859, 38 N. H. 459, it was decided that the term, “minister of the Congregational persuasion,” as used in a will made in 1817, was broad enough to include a Unitarian minister.
The Constitution of Massachusetts provided that all taxes paid by any person for religious teaching shall, if he require it, be applied to the support of the public teacher “ of his own religious sector denomination,” if “ there be any one whose instructions he attends.”
Under this clause it was decided that Universalists were a different denomination from Congregationalists. Murray v. Inhabitants of First Parish in Gloucester, Supreme Court, Essex County, June, 1786; 2 Dane, Abr. 330. And Presbyterians were held to be a different sect from Congregationalists. Annan v. Inhabitants of West Parish in Salisbury, Supreme Court, Essex County, 1796; 2 Dane, Abr. 335.
In Holbrook v. Holbrook, 1822, 1 Pick. 248, 256, Pakicek, C. J., said, “Having no reports of judicial decisions prior to the year 1804, we have lost an important part of our history in relation to the construction of the Constitution and the Declaration of Rights; but we have a traditionary ' account that it was early decided that difference of denomination, as the term is used in the Declaration, consists in a difference of church discipline and mode of administering some of the Christian ordinances; not in difference of opinion on doctrines of theology. Episcopalians, Congregationalists, Presbyterians, Baptists, and others were each of different denominations; but Christians belonging to either of those sects were of the same denomination, however widely they might differ as to the essential or non-essential matters of faith or. doctrine.”